## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **NGAMBULA WABIBI, Individually as Surviving Parent of FRANCIS WABIBI, Deceased, VEMBA WABIBI, Individually as Surviving Parent of FRANCIS WABIBI, Deceased, and SHANA WABIBI as Anticipated Administrator of the Estate of FRANCIS WABIBI, Deceased;** | ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| | ) **CIVIL ACTION** |
| **v.** | ) ) **FILE NO.: _____** |
| **FULTON COUNTY, GEORGIA, SHERIFF PATRICK LABAT, Individually, LIEUTENANT ANTONIO RICHARDSON, Individually, DETENTION OFFICER S. TILLEY, Individually, CAPTAIN JAMARL JOHNSON, Individually, and CADET DEPUTY ANTHONY OKONKWO, Individually,** | ) ) ) ) ) ) ) ) ) ) |
| | ) **Jury Trial** |
| **Defendants.** | ) **Demanded** |

## COMPLAINT FOR DAMAGES

COMES NOW PLAINTIFF NGAMBULA WABIBI, Individually as
Surviving Parent of FRANCIS WABIBI, Deceased, PLAINTIFF VEMBA
WABIBI, Individually as Surviving Parent of FRANCIS WABIBI, Deceased, and
PLAINTIFF SHANA WABIBI as Anticipated Administrator of the Estate of
FRANCIS WABIBI (collectively Plaintiffs"), and, by and through undersigned

counsel, hereby file this Complaint for Damages, respectfully showing the Court as follows:

## Preliminary Statement

1.

This is a civil action pursuant to 42 U.S.C. § 1983 to redress deprivations, under color of state law, of Francis Wabibi's clearly established civil rights secured by the Eighth and Fourteenth Amendments to the United States Constitution and pursuant to Georgia's Wrongful Death Act, O.C.G.A. § 51-4-2, which establishes a claim for "the full value of the life of the decedent." Claims are hereby filed pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for civil rights violations, unsafe jail conditions, deliberate indifference, substantive due process violations, *Monell* unconstitutional customs, policies, and or practices violations, and *Canton* claims for failure to supervise and discipline.

## Causes of Action, Jurisdiction & Venue

2.

This Court has original subject matter jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction pursuant to the provisions 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and by the laws of the State of Georgia, pursuant to 28 U.S.C. § 1367(a), because the

state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

3.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all incidents and or occurrences giving rise to this action occurred in this District, Plaintiffs reside in this judicial District, some or all of the Defendants reside in this judicial district, and the events or omissions giving rise to these claims arose here.

4.

Defendants' conduct under color of state law proximately caused the deprivation of Francis Wabibi's federally protected rights and ultimately, his death.

5.

Jurisdiction supporting a claim for attorney fees and costs is conferred by 42 U.S.C. §§ 1983, 1988, the 14th and 8th Amendments to the United States Constitution, and relevant Georgia law.

6.

This action has been brought within 2 years of the subject incident and all public-entity notice provisions have been met. An ante-litem sent in this case is attached to this Complaint as Exhibit A.

7.

No personal representative of the Estate of Francis Wabibi has been appointed, and, therefore, the statute of limitations pertaining to claims arising in personal injury and tort is currently tolled by operation of law as to the Estate of Francis Wabibi. As such, the claims brought on behalf of the Estate of Francis Wabibi in the instant action are not barred by the statute of limitations.

8.

This Court has personal jurisdiction over Defendant Fulton County, Georgia.

9.

This Court has personal jurisdiction over Defendant Sheriff Patrick Labat. (Hereinafter referred to as "Defendant Labat")

10.

This Court has personal jurisdiction over Defendant Lieutenant Antonio Richardson. (Hereinafter referred to as "Defendant Richardson")

11.

This Court has personal jurisdiction over Defendant Detention Officer S. Tilley. (Hereinafter referred to as "Defendant Tilley")

12.

This Court has personal jurisdiction over Defendant Captain Jamarl Johnson. (Hereinafter referred to as "Defendant Johnson").

13.

This Court has personal jurisdiction over Cadet Deputy Anthony Okonkwo. ("Hereinafter referred to as "Defendant Okonkwo")

## The Parties

14.

Plaintiff Ngambula Wabibi is the surviving mother of Francis Wabibi, deceased.

15.

Plaintiff Vemba Wabibi is the surviving father of Francis Wabibi, deceased.

16.

Francis Wabibi was unmarried and without children at the time of his death on November 23, 2022.

17.

Plaintiff Ngambula Wabibi brings this claim in her individual capacity to recover for the wrongful death of her son, Francis Wabibi, under Georgia's wrongful-death statute.

18.

Plaintiff Vemba Wabibi brings this claim in his individual capacity to recover for the wrongful death of his son, Francis Wabibi, under Georgia's wrongful-death statute.

19.

Plaintiff Shana Wababi is the Anticipated Administrator of the Estate of Francis Wabibi and will be substituted in such capacity upon her appointment as Administrator to bring claims on behalf of Francis Wabibi's estate.

20.

Defendant Fulton County, Georgia ("Fulton County"), is a political subdivision of the State of Georgia.

21.

Defendant Fulton County, Georgia, can be served by serving the Chairman of the Fulton County Board of Commissioners, Rob Pitts, at his place of employment located at 141 Pryor Street, 10th Floor, Atlanta, GA 30303, or by serving an agent authorized by appointment to receive service of process.

22.

Defendant Fulton County, Georgia, is the policy maker for determining the budget of the Fulton County Sheriff's Office.

23.

Sheriff Patrick Labat is the elected Sheriff of Fulton County, Georgia, holding office by virtue of the constitution and laws of the State of Georgia, and was acting in the course and scope of his employment and under the color of law at all times

relevant hereto and is sued herein in his individual capacity for purposes of his actions and policies and training of law enforcement personnel under his control and supervision and for establishing a policy or pattern of widespread constitutional deprivations at the Fulton County Jail.

24.

Sheriff Patrick Labat is the Policy Maker for the Fulton County Sheriff's Office.

25.

Sheriff Patrick Labat can be served at his place of employment, the Fulton County Sheriff's Office, 185 Central Ave SW, Atlanta, GA 30303.

26.

Lieutenant Antonio Richardson was at all relevant times an employee of the Fulton County Sheriff's Office and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incident occurred.

27.

Lieutenant Antonio Richardson can be served at said Defendant's place of employment, the Fulton County Sheriff's Office, 185 Central Ave SW, Atlanta, GA 30303, or at said Defendant's residence in the State of Georgia.

28.

Detention Officer S. Tilley was at all relevant times an employee of the Fulton County Sheriff's Office and was acting under color of state law and was acting in the course and scope of her employment at the time the subject incident occurred.

29.

Detention Officer  S. Tilley can be served at said Defendant's place of employment, the Fulton County Sheriff's Office, 185 Central Ave SW, Atlanta, GA 30303, or at said Defendant's residence in the State of Georgia.

30.

Captain Jamarl Johnson was at all relevant times an employee of the Fulton County Sheriff's Office and was acting under color of state law and was acting in the course and scope of his employment at the time the subject incident occurred.

31.

Captain Jamarl Johnson can be served at said Defendant's place of employment, the Fulton County Sheriff's Office, 185 Central Ave SW, Atlanta, GA 30303, or at said Defendant's residence in the State of Georgia.

32.

Cadet Deputy Anthony Okonkwo was at all relevant times an employee of the Fulton County Sheriff's Office and was acting under color of state law and was

acting in the course and scope of his employment at the time the subject incident occurred.

33.

Cadet Deputy Anthony Okonkwo can be served at said Defendant's place of employment, the Fulton County Sheriff's Office, 185 Central Ave SW, Atlanta, GA 30303, or at said Defendant's residence in the State of Georgia.

34.

Fulton County and the Fulton County Sheriff's Office each receive some form of federal funding.

35.

At all times mentioned in this Complaint, the Defendants acted jointly and in concert with each other.  Each Defendant had the duty and the opportunity to protect the decedent from the unlawful actions of the other Defendants, but each Defendant failed and refused to perform such duty, thereby proximately causing the injuries herein complained of.

**Facts Related to All Counts**

36.

In 2013, Francis Wabibi was diagnosed with depressive disorder and was admitted to an inpatient facility for mental-health treatment.

37.

Francis Wabibi was subsequently diagnosed with major depressive disorder with severe psychotic features.

38.

By 2019, Francis Wabibi had been diagnosed with schizophrenia.

39.

In September of 2022, Francis Wabibi had become homeless due to his mental-health status.

40.

On September 21, 2022, Francis Wabibi was arrested for loitering and obstructing a police officer.

41.

In Francis Wabibi's arrest files it is evident that he suffered from mental health problems.

42.

Defendants read and were aware of Mr. Wabibi's arrest files and therefore knew of his mental health problems.

43.

Following his arrest, Francis Wabibi was placed into the custody of the Fulton County Jail as a pre-trial detainee.

44.

On October 31, 2022, Francis Wabibi was attacked in his cell by his cellmate and received a bloody nose. (Hereinafter referred to as "Incident 1").

45.

On Monday October 31, 2022, Detention Officer S. Tilley was assigned to 3 North for the 7PM-7AM Shift at the Fulton County Jail.

46.

At approximately 12:45 AM on October 31, 2022, Mr. Wabibi's cellmate Michael Price attacked Mr. Wabibi causing Mr. Wabibi to suffer from a nose bleed.

47.

According to Detention Officer S. Tilley, she learned of the incident when Mr. Wabibi's cellmate Michael Price was screaming from his cell door that Mr. Wabibi's nose was bleeding.

48.

Detention Officer S. Tilley investigated the incident and made a report.

49.

After Incident 1, Detention Officer S. Tilley placed Mr. Wabibi back into Cell 316 and sat his cellmate in zone 700 until the staff could relocate the cellmate.

50.

The supervisor on shift during the first incident was Sgt William Peeks, and he was assigned to the Medical observation Unit for the 7PM-7AM shift.

51.

Sgt William Peek became aware of the assault onto Mr. Wabibi when he spoke with Officer S. Tilley about it.

52.

According to Sgt. William Peek's Supervisor Investigation Report, he spoke with inmate Michael Price about Incident 1.

53.

According to Sgt. William Peek's Supervisor Investigation Report, he could not "get a statement from inmate Wabibi due to his mental health status."

54.

Sgt. William Peek's Supervisor Investigation Report Conclusion was "After all information gathered, I recommend both inmates be relocated into different zones but stay on 3 North due to their mental health. No charges shall be filed due to both inmates mental health status."

55.

As indicated by the above conclusion, Mr. Wabibi was housed in 3 North due to his mental health problems.

56.

By virtue of Mr. Wabibi's housing locations and records concerning his mental health, Defendants were well aware of Mr. Wabibi's mental health status and vulnerabilities.

57.

Lieutenant Chantae Taylor read the incident reports in their entirety and agreed with Sgt William Peek's conclusions.

58.

Detention S. Tilley had subjective knowledge of a substantial risk to Francis Wabibi's safety due to his schizophrenia and placement within the jail population with far more violent inmates.

59.

On November 3, 2022, Francis Wabibi was once again attacked in his cell by a different cellmate. ("Hereinafter referred to as Incident 2").

60.

On Thursday November 3, 2022, Detention Officer Brooklyn Unitas was assigned to 3 North as the floor officer on the 7A-7P shift.

61.

Mr. Wabibi was attacked on November 3, 2022 at 12:00 PM by his new cellmate Ashley Parker.

62.

According to Detention Officer Brooklyn Unitas, she learned of the incident when she heard yelling coming from the bottom tier and looked down the stairs to see inmate Ashley Parker yelling at Inmate Francis Wabibi.

63.

According to Detention Officer Brooklyn Unitas, she then saw inmate Ashley Parker smack Mr. Wabibi twice in the head.

64.

According to Detention Officer Brooklyn Unitas, Fulton County Jail supervisors were notified of this incident.

65.

Lieutenant Antonio Richardson created a Manager Approval Report concerning this incident.

66.

On November 03, 2022, Lieutenant Antonio Richardson was assigned as a Unit Manager of the Fulton County Jail.

67.

According to Lieutenant Antonio Richardson, he was advised of this incident at approximately 1400 hours.

68.

According to Lieutenant Antonio Richardson, he spoke to Detention Officer Brooklyn Unitas, who informed Lieutenant Antonio Richardson that while she was conducting feeding, she witnessed inmate Ashley Parker deliver an open hand strike to the head of Francis Wabibi.

69.

According to Lieutenant Antonio Richardson, he spoke to inmate Ashley Parker about Incident 2.

70.

Once again, no charges were filed against Francis Wabibi or his cellmate due to their mental health status, as noted in the Jail's incident report.

71.

According to Lieutenant Antonio Richardson, "In conclusion, I recommend that inmates Parker and Wabibi be relocated from each other to avoid any further conflict. Due to the mental state of each inmate and severity of the altercation, neither inmate will be charged at this time, however, jail sanctions may still be administered."

72.

Lieutenant Antonio Richardson had subjective knowledge of a substantial risk to Francis Wabibi's safety due to his schizophrenia and placement within the jail population with far more violent inmates.

73.

Lieutenant Antonio Richardson's relocation of Mr. Wabibi caused him to share a cell with Simeon Keith Lucas, a known violent inmate who had previous convictions for robbery, terroristic threats, stalking, intimidation, larceny, and cocaine-related offenses.

74.

Lieutenant Antonio Richardson knew that placing a person suffering from schizophrenia, such as Francis Wabibi—who was not a violent criminal—in a cell with a violent convicted felon, created a substantial risk of serious harm, especially given that Francis Wabibi had already been attacked by his previous two cellmates.

75.

Despite possessing subjective knowledge of the danger that Francis Wabibi had been placed into, Lieutenant Antonio Richardson was consciously indifferent to those risks and did not adequately ensure Francis Wabibi's safety.

76.

Francis Wabibi was subsequently placed in a cell with Simeon Keith Lucas, a known violent inmate who had previous convictions for robbery, terroristic threats, stalking, intimidation, larceny, and cocaine-related offenses.

77.

Upon information and belief, inmate Simeon Keith Lucas earned the Alias "Loosecase" and possessed a notoriously violent reputation.

78.

Upon information and belief, Simeon Keith Lucas weighed approximately 185 pounds while Mr. Wabibi weighed approximately 120 pounds.

79.

On November 23, 2022, Detention Officer S. Tilley was assigned as a floor officer to 3 North, where Francis Wabibi's room was located.

80.

On November 23, 2022, Cadet Deputy Anthony Okonkwo was assigned as a floor officer to 3 North, where Francis Wabibi's room was located.

81.

On November 23, 2022, Captain Jamarl Johnson was assigned as Watch Commander.

82.

Detention Officer  S. Tilley knew that placing a person suffering from schizophrenia, such as Francis Wabibi—who was not a violent criminal—in a cell with a violent convicted felon created a substantial risk of serious harm, especially given that Francis Wabibi had already been attacked by his previous two cellmates.

83.

Despite possessing subjective knowledge of the danger that Francis Wabibi had been placed into, Detention Officer S. Tilley was consciously indifferent to those risks and did not adequately ensure Francis Wabibi's safety.

84.

Cadet Deputy Anthony Okonkwo knew that placing a person suffering from schizophrenia, such as Francis Wabibi—who was not a violent criminal—in a cell with a violent convicted felon created a substantial risk of serious harm, especially given that Francis Wabibi had already been attacked by his previous two cellmates.

85.

Despite possessing subjective knowledge of the danger that Francis Wabibi had been placed into, Cadet Deputy Anthony Okonkwo was consciously indifferent to those risks and did not adequately ensure Francis Wabibi's safety.

86.

Captain Jamarl Johnson knew that placing a person suffering from schizophrenia, such as Francis Wabibi—who was not a violent criminal—in a cell with a violent convicted felon created a substantial risk of serious harm, especially given that Francis Wabibi had already been attacked by his previous two cellmates.

87.

Despite possessing subjective knowledge of the danger that Francis Wabibi had been placed into, Captain Jamarl Johnson was consciously indifferent to those risks and did not adequately ensure Francis Wabibi's safety.

88.

At approximately 2:00 A.M., Detention Officer S. Tilley relieved Cadet Deputy Anthony Okonkwo from the security tower and Cadet Deputy Anthony Okonkwo began to make security rounds of 3 North.

89.

At approximately 2:05 A.M., Cadet Deputy Anthony Okonkwo started doing security rounds and found Francis Wabibi unresponsive in cell 205 with his feet and hands tied.

90.

During the attack, the overnight floor officer on the mental health unit was actually working inside the tower. When the officer eventually conducted his security rounds, he found the victim lying on a cell floor with his hands tied behind

his back and his ankles bound. Medical determined that he was already dead and

"extremely cold."

91.

Francis Wabibi had been tied up and beaten severely by his cellmate.

(Hereinafter referred to as the "Attack").

92.

According to medical records, the Grady EMS received the call at 3:00AM

on November 23, 2022 regarding Mr. Wabibi.

93.

According to the medical records, the Trauma team was notified at 3:03 AM

on November 23, 2022 regarding Mr. Wabibi.

94.

According to the medical records, Mr. Wabibi's Patient Arrival Time was

3:14 AM on November 23, 2022.

95.

Mr. Wabibi arrived at Grady Hospital via ambulance at 3:14 AM on

November 23, 2022.

96.

According to Registered Nurse April Morris, Mr. Wabibi was down for

approximately 60 minutes.

97.

According to medical records, Mr. Wabibi was estimated 45-60 minutes of downtime per EMS and given Epinephrine x4 en route.

98.

Mr. Wabibi suffered from significant head trauma with a right tracheal deviation as a result of the Attack.

99.

When Mr. Wabibi arrived at Grady Hospital, he was intially diagnosed with facial trauma and traumatic cardiac arrest.

100.

At Grady Hospital, providers noted that Mr. Wabibi had been strangled.

101.

At Grady Hospital, providers noted that Mr. Wabibi's feet were bound by fabric.

102.

According to Grady Providers, given that the traumatic mechanism was related to strangulation without any known intrathoracic injury in setting of prolonged down time and low chance for good neurologic outcome, the decision was made to discontinue resuscitative efforts.

103.

Francis Wabibi was pronounced dead at 3:17 AM on November 23, 2022.

104.

According to Mr. Wabibi's Death Certificate, his immediate cause of death was blunt force injuries of the head.

**Facts Related to Counts I, V, VI, VII, and VIII**

105.

The Fulton County Jail (hereinafter referred to as "Jail")is the secure detention facility for people awaiting resolution of criminal charges in Fulton County.

106.

The entities responsible for the Jail are the Fulton County Sheriff's Office, which operates the Jail, and Fulton County, which funds the Jail.

107.

The Fulton County Sheriff is Sheriff Patrick "Pat" Labat. Sheriff Labat took office in January 2021.

108.

The seven-member Fulton County Board of Commissioners is the governing body for Fulton County. Through the Board of Commissioners, Fulton County provides funding for the Jail and maintains the Jail facilities.

109.

The County sets funding levels for the Sheriff's Office, but the Sheriff is an independent, elected official whose authority is defined in the Georgia constitution.

110.

Unfortunately, this tragedy was far from an isolated incident. Indeed, Fulton County Jail has been engulfed in controversy over recent years—and its inmates have suffered as a result.

111.

On Oct. 19, 2022, roughly a month before Francis Wabibi was murdered in his cell, inmate Shamar McElroy was likewise found murdered in his cell by a fellow inmate in Fulton County.

112.

In April 2024, a 37-year-old man died after being assaulted by another incarcerated person. Medical staff found the victim lying at the entrance of the housing unit with multiple wounds and covered in blood. The victim was stabbed 20 times with a nine-inch weapon and sustained stab wounds to the head, neck, torso, arms, and legs.

113.

In August 2023, a 23-year-old man died when he was stabbed multiple times by one or more other incarcerated people. The victim was found lying face down

on the floor of the dayroom in a pool of blood with deep lacerations to his upper back. He had stab wounds to his head, neck, abdomen, back, and arms.

114.

In August 2023, a 34-year-old man died from strangulation. The victim was found unresponsive in his cell.

115.

In November 2022[1], a 32-year-old man died in the mental health unit after his cellmate assaulted him. The victim's feet were bound, and he had a bloody nose and "raccoon eyes," a sign of head trauma. Medical responders reported that his body was cold to the touch.

116.

In October 2022, a 20-year-old man died in the mental health unit after being strangled by his cellmate. The victim was found wrapped in a county-issued blanket with straps tied around his ankles, knees, waist, chest, and neck.

117.

In September 2022, a 33-year-old man died after being stabbed by another incarcerated person. The victim had a stab wound between his shoulder and neck and a deep gaping wound above his eyebrow.

---

[1] This death which was identified from the DOJ Investigation into Fulton County findings report is likely referencing Mr. Wabibi's attack.

118.

A significant percentage of the homicide victims described above had one or more serious mental illnesses. All had been incarcerated for months or years: Their average length of stay in the Jail was 253 days; the longest stay was 654 days.

119.

According to DOJ findings, people with serious mental illness are particularly vulnerable to violence in the Jail.

120.

Two people with serious mental illness were killed by cellmates in the Jail's mental health unit in the fall of 2022; one of these victims had an intellectual disability.

121.

In February 2023, five serious assaults occurred against people in the mental health unit by their cellmates.

122.

In some cases, people perceived as mentally ill or who act strangely are forced out of housing areas by other incarcerated people.

123.

In April 2023, an incarcerated person reported that he feared for his life, because he heard people on the zone announce, "these mental health n[*****]

going on the door tonight," and believed that he and others with mental health needs would be forced to leave the housing area.

124.

In 2023, there were more than 300 stabbings in the Jail which involved uncontrolled contraband and makeshift weapons.

125.

In one case in August 2023, medical staff at the Jail treated an incarcerated person after several other incarcerated people reportedly stabbed him in the face and beat him. He reported pain and difficulty breathing, and medical staff sent him to the hospital for a possible rib fracture.

126.

In July 2023, an incarcerated person was sent to the hospital after another assault by multiple people. He had nine total stab wounds and required care for complex lacerations and to rule out a tendon injury to his hand.

127.

In May 2023, an incarcerated person was sent to the hospital for injuries to his scalp, chest, arm, thigh, back, and hand from a stabbing. His assailant used a 16-inch shank in the attack.

128.

Assaults and stabbings with man-made "shanks" are a feature of life at the Jail.

129.

In May 2024, four incarcerated people entered another man's cell and stabbed him eight times in his sleep.

130.

Days before an April 2024 stabbing death, another incarcerated man was stabbed in the head and did not seek medical treatment for ten hours because of ongoing threats on his life.

131.

One of the 2023 homicide victims was injured in three previous stabbings at the Jail.

132.

There have been four deaths from suicide in the past four years, including as recently as April.

133.

In April 2024, an incarcerated person died in the Jail after being stabbed 20 times. Less than a week later, a man was found dead in his cell, likely hours after his death.

134.

Deaths and serious injuries remain prevalent at the Jail. Thus far in 2024, three men at the Main Jail have died: one of a suspected drug overdose, one by stabbing, and one by suicide.

135.

Indeed, the Jail has had the highest death rate of all jails in Georgia over the last decade.

136.

Between 2009 and October 2022, more than 60 inmates died at the Jail, the highest total for any jail in Georgia during that time.

137.

In 2022, the Jail also endured 11 fires, at least 534 fights, and 114 stabbings.

138.

As of early November, the sheriff's office had counted nearly 300 stabbings at the Fulton County Jail, with more than 900 inmate-on-inmate assaults and 68 assaults on staff.

139.

For all the jails in Fulton County combined, 1,293 stabbings were reported; nearly 1,200 shanks were discovered; 922 assaults were committed by inmates on other inmates; and 68 incidents where staff were assaulted. At this time, the Fulton

County Jail was housing 1,928 inmates with only 1,875 beds available due to structural issues with the building.

140.

According to Sheriff's Office reports, in 2023 there were 1,054 assaults on incarcerated people and 314 stabbings in the Jail.

141.

The Jail had 1.5 times the rate of stabbings in the New York City Jails and more than 27 times the rate of all incidents involving an edged weapon in the Miami-Dade County Jails. The Jail had as many stabbings in a single month as the Miami-Dade County Jails—which house 1.5 times more people—had all year.

142.

In the first nine months of 2023, there were over 200 emergency transports of incarcerated people to an outside hospital for injuries from assaults.

143.

The Jail has become so dilapidated that inmates are able to fashion makeshift weapons by reaching into the walls and removing broken flooring, electrical coverings, and broken pipes.

144.

In some cases, officers have allowed or initiated violence at the Jail.

145.

In February 2023, a detention officer opened a door to let an incarcerated person leave his assigned housing zone and enter another housing zone, where he and multiple others attacked someone. Although the officer witnessed the assault, she did not report it or get medical help for the victim, and she later sprayed cleaning solution on the blood. The officer was terminated and criminally charged for her conduct.

146.

In April 2022, a Jail deputy was fired after he opened an incarcerated person's cell, brought him to another person's cell, then stood by and watched as the two men fought.

147.

There is also reason to believe that the Sheriff's Office data does not capture the true extent of the violence inside the Jail. Not all violent incidents at the Jail are reported and appropriately documented.

148.

For example, in September 2023, the U.S. Department of Justice advised counsel for the County and Sheriff's Office of a report that an incarcerated person had been stabbed the week before and required medical attention. In response, the Jail's medical staff met with this person and confirmed that he had multiple stab wounds to his chest, back, and hands. No incident report documents this assault,

and the person told medical staff that although he reported the stabbing to an officer, he was not taken to medical for treatment until the DOJ alerted counsel of the incident.

149.

The DOJ also identified instances of incarcerated people transported to an outside hospital for injuries consistent with violent assaults without incident reports documenting what had occurred.

150.

Low staffing levels in the Jail contribute to the failure to report many violent incidents.

151.

Fulton County officials have come under fire for the mounting violence, overcrowding, excessive force, lack of appropriate care, and unsanitary conditions in the Fulton County Jail. The violence and dysfunction that plagues the Jail has met the threshold to draw attention from both federal and state government bodies.

152.

Both a Georgia Senate committee and the U.S. Department of Justice have started their own investigations into the issues..

153.

Following the news that a tenth person died in a year alone while being held at the Fulton County Jail, it was announced a Georgia Senate panel was established to look into the overcrowding, backlog of cases, and dangerous conditions at the facility. Georgia lawmakers have stated they are focusing on the jail conditions, funding, management, and the court system.

154.

On July 13, 2023, the U.S Department of Justice Civil Rights Division announced it had opened a civil investigation into the conditions in the Fulton County Jail in Georgia.

155.

Based on an extensive review of publicly available information and information gathered from stakeholders, the Department has found significant justification to open this investigation, including credible allegations that an incarcerated person died covered in insects and filth, that the Fulton County Jail is structurally unsafe, that prevalent violence has resulted in serious injuries and homicides, and that officers are being prosecuted for using excessive force.

156.

Within weeks of opening the investigation, six more Black men had died in the Jail. One person was found unresponsive in his cell after his cellmate strangled him. And days later, tensions in the Jail erupted in violence: within 24 hours, five

units in the Jail saw violent assaults, at least seven people were stabbed, and one person was killed.

157.

The U.S. Justice Department (DOJ) announced on November 15, 2024 its findings that conditions of confinement at the Fulton County Jail in Georgia violate the 8th and 14th Amendments to the U.S. Constitution, the Americans with Disabilities Act, and Individuals with Disabilities Education Act. The findings for this investigation are attached to this Complaint as Exhibit B.

158.

The Justice Department conducted its investigation of the Fulton County Jail under the Civil Rights of Institutionalized Persons Act (CRIPA), Americans with Disabilities Act, and the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601, which prohibits law enforcement officers from engaging in a pattern or practice of conduct that deprives people of rights protected by the Constitution or federal law.

159.

The DOJ's report detailed its findings from a comprehensive investigation of the Jail, funded and operated by Fulton County and the Fulton County Sheriff's Office.

160.

The investigation included the Main Jail in Atlanta and three annex facilities: the Marietta Annex in Atlanta, the North Annex in Alpharetta, and the South Annex in Union City.

161.

According to Attorney General Merrick B. Garland, "The Justice Department's report concluded that Fulton County and the Fulton County Sheriff's Office allowed unsafe and unsanitary conditions at the Jail. As a result, people incarcerated in the Fulton County Jail suffered harms from pest infestation and malnourishment and were put at substantial risk of serious harm from violence by other incarcerated people — including homicides, stabbings and sexual abuse. The unconstitutional and unlawful conditions at the Fulton County Jail have persisted for far too long, and we are committed to working with Fulton County and the Fulton County Sherrif's office to remedy them."

162.

According to Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division, "Detention in the Fulton County Jail has amounted to a death sentence for dozens of people who have been murdered or who died as a result of the atrocious conditions inside the facility. It's not just adults but also children who are subjected to conditions and treatment that violate the constitution and defy federal law. Many people held in jails in our country have not

been convicted — they are awaiting hearings, trial dates or are serving short sentences for misdemeanors. At the end of the day, people do not abandon their civil and constitutional rights at the jailhouse door. Jails and prisons across the country must protect people from the kind of gross violations and unconstitutional conditions that we have uncovered here".

163.

According to U.S. Attorney Ryan K. Buchanan for the Northern District of Georgia, "In Fulton County, people in custody awaiting formal charges or trials frequently must protect themselves from brutal physical attacks, endure frequent excessive force, manage their wellbeing with inadequate food and unsanitary living conditions, and hope they can find access to a strained medical and mental health care program. This is unacceptable,"

164.

Following an extensive investigation, the DOJ concluded that Fulton County and the Fulton County Sheriff's Office routinely violated the rights of people incarcerated at the Jail. Specifically, the department found that the Jail, among other things:

     a. Failed to protect people from the substantial risk of serious harm from violence by other incarcerated people, including homicides, stabbings, and sexual abuse. Poor supervision, classification, Jail maintenance,

contraband control, and investigations contribute to the unacceptable violence.

b.  Housed incarcerated people in unconstitutional living conditions that are unsanitary and dangerous.

c.  Failed to provide adequate medical and mental health services to incarcerated people.

165.

According to the DOJ findings, serious violence at the Jail has harmed people with mental health needs and other vulnerable populations.

166.

Assaults are carried out with weapons fashioned from Jail fixtures and are made possible by physical deficiencies in the Jail environment, such as unlocked doors.

167.

Leadership at the County and Sheriff's Office are aware of the violence in the Jail and have publicly decried it. Yet they have failed to take adequate action to address the crisis, and homicides, stabbings, and other violent acts continue at dangerous levels.

168.

Poor supervision, poor classification practices, and inattention to the maintenance of the Jail are major contributors to the unacceptable violence.

169.

According to the DOJ findings, Fulton County Jail living conditions do not meet basic constitutional standards.

170.

The Jail has allowed housing areas to fall into a state of serious disrepair, with standing water collecting in living areas, exposed wires, pests poorly controlled, and deficient services for providing clean clothing and sheets. These conditions are dangerous and unsanitary. Meals are served to the incarcerated population in an unsanitary manner and do not meet nutritional standards. As a result, people in the Jail have suffered harms from pest infestation and malnourishment.

171.

According to the DOJ findings, medical and mental health care in the Fulton County Jail do not meet constitutional standards.

172.

The Jail impedes access to medical and mental health care through a lack of security staff.

173.

Medication administration gaps lead to medical and mental health complications and injuries.

174.

When medical emergencies occur, the Jail fails to provide appropriate medical care. And although people with mental health needs are overrepresented in the Jail population, the Jail environment exacerbates symptoms of mental illness.

175.

According to the DOJ findings, the Jail does not adequately treat serious mental health needs.

176.

The Jail does not house people appropriately to reduce the risk of violence. Jails should use correctional practices such as classification, housing plans, assessment of the likelihood of victimization, and consideration of gang affiliations to manage the incarcerated population and reduce the risk of violence. The Jail's failure to effectively implement these jail practices contributes to the dangerous nature of the Jail.

177.

The Jail's deficient classification system and housing plan increase the risk of violence.

178.

Fulton County Jail's classification system does not conform to generally accepted jail practices, because it relies almost exclusively on arrest charges and ignores other risk factors, including in-custody conduct. Jail policy contemplates reviewing an individual's classification every 90 days and as needed, but in practice, re-classifications do not occur.

179.

Rather than reclassifying people at regular intervals, Jail staff move people around to different zones if they pose a problem. If problems persist, staff may eventually move the person to a higher floor of the Main Jail, which generally corresponds to higher custody levels. Jail classification staff confirmed, however, that this shuffling among floors often results in multiple custody levels in the same housing zone.

180.

The Jail also mixes all custody levels together on the second floor of the Main Jail for about two weeks when incarcerated people are first admitted to the Jail. This mixing of incarcerated people with different custody levels in the same zone is unsafe. In the South Annex, the housing plan does not even seek to separate people according to their custody levels, instead identifying every unit as "LOW-MED-MAX."

181.

The Jail does not use housing assignments to effectively mitigate the risk of gang violence. Despite the violence associated with gang activity at the Jail, the Jail fails to identify and track many gang-affiliated people in the Jail. Without such identification and tracking, the Jail cannot use known gang affiliations to keep members of any one gang from gaining influence and separate rival gangs.

182.

According to the DOJ findings, the Jail does not provide adequate staffing and supervision to keep people safe.

183.

Fulton County Jail staff are rarely present in the housing units and do not perform adequate security rounds or otherwise monitor people to prevent harm. As a result, staff fail to intervene to stop violence between incarcerated people and often fail to promptly respond to violent incidents.

184.

The Jail regularly operates without enough security staff to provide appropriate supervision and prevent violence.

185.

According to the DOJ, violence occurs at the Jail as a direct result of the understaffing.

186.

For example, in August 2023, a single detention officer was assigned to monitor a housing unit of nearly 100 incarcerated people overnight. He left the unit to get ice. Upon returning at about 1:00 a.m., he saw three incarcerated people fighting in the dayroom; two were "drenched in blood." One person involved in the fight told officers that he saw one of the other people trying to leave the cell or zone, and "took it upon himself to stop [him]."

187.

Similarly, a September 2022 homicide occurred when the floor officer left his assigned unit of around 100 incarcerated people to deliver paperwork and exchange his Taser cartridge. While he was gone, incarcerated people alerted the tower officer that someone was "laid out on the floor." The tower officer called the floor officer assigned to another unit to respond. When that officer arrived, the victim was face down in a puddle of blood with no signs of movement.

188.

Officers reported to the DOJ of having to work inside housing units with no one posted in the tower, and the DOJ observed vacant towers during their site inspections. Without staff in the tower, there is no one with eyes on all six housing units, no one to call for backup if a floor officer becomes incapacitated, and no one to respond when incarcerated people call the tower to ask for help.

189.

Properly conducted well-being checks, referred to as "security rounds" in the Jail, are critical to the safety and security of people incarcerated in the Jail. During security rounds, officers should verify that all incarcerated people are alive and well, learn of any urgent needs like medical distress, identify security concerns like contraband or broken locks, and provide a presence in the housing units to deter misconduct.  Security rounds should occur at irregular intervals, with no more than 60 minutes between rounds.

190.

A DOJ review of the Jail's records found gaps of many hours between recorded security rounds, and officers recorded performing only a fraction of required safety checks.

191.

When Jail staff do perform security rounds, they often only conduct a "visual security round" from inside the tower, but Jail staff cannot see all areas of the unit from there, including inside cells.

192.

Jail staff generally reported to the DOJ that floor officers do not perform hourly security rounds inside the housing units, and they cited short staffing and the need to handle other tasks, such as medical or attorney visits, as the reason.

193.

Surveillance cameras can be monitored from central control and the towers to improve supervision, but do not substitute for the regular presence of deputies and detention officers inside the housing units. However, Jail staff are not always in the towers to monitor the camera feeds, and the cameras do not show inside showers, cells (other than padded cells), and holding areas, where violence may occur.

194.

Jail staff are often unaware of extreme violence, leading to lengthy delays in response times and medical care.

195.

For example, in May 2024, despite an obvious assault where two incarcerated people fell down a staircase in a housing zone, over two hours passed before officers found the victim wrapped in a bloody towel.

196.

Similarly, in January 2023, an incarcerated man reported that he was brutally assaulted over four days, but officers were unaware of the attacks until the man passed a note asking for help.

197.

Again, when the November 2022[2] killing occurred, the overnight floor officer on the mental health unit was actually working inside the tower. When the officer eventually conducted his security rounds, he found the victim lying on a cell floor with his hands tied behind his back and his ankles bound. Medical determined that he was already dead and "extremely cold."

198.

The unlawful and dangerous practices identified in the report are long-standing and have contributed to multiple deaths and other serious harm.

199.

According to the DOJ findings, Jail leadership is aware of chronic short staffing at the Jail.

200.

For example, the Sheriff told a Georgia Senate Subcommittee in May 2024 that there should be 50–60 staff for each 12-hour shift at the Jail, and that the Jail had never achieved that staffing level.

201.

Similarly, in 2023 the County and Sheriff's Office increased salaries for people working in the Jail (to $60,000 for deputies and $54,000 for detention

---

[2] As mentioned above, this was identified by the DOJ in an investigation and is likely referring to Mr, Wabibi's attack.

officers) and approved paying double overtime. In March 2024, the Board of Commissioners rejected the Sheriff's request to continue the double overtime payments, describing them as a temporary measure.

202.

Similarly, in July 2023, the Sheriff's Office contracted to have private security specialists work in the towers and mitigate understaffing. But in August 2024, the private security officers walked off the job after the contractor said it had not been paid in three months, was owed over a million dollars, and was ending the contract with the Jail.

203.

The Sheriff's Office described a "significant budget crisis" that led to the nonpayment of this contract and left the Jail scrambling to cover abandoned posts.

204.

In light of the danger associated with short staffing and the long-standing nature of the problem, the DOJ found that Jail leaders have not taken adequate measures to improve staffing and supervision at the Jail.

205.

The widespread availability of drugs in the Jail also contributes to the violence at the Jail.

206.

Significant amounts of drugs are trafficked into the Jail.

207.

A search in January 2024 uncovered over 400 suspected ecstasy pills along with suspected marijuana, Percocet pills, 10 cellphones, and drug paraphernalia, including a digital scale.

208.

During a site inspection at the Main Jail in October 2023, staff informed the DOJ that an incarcerated person the DOJ was interviewing was suspected of being high on fentanyl, and staff found fentanyl in two separate housing areas at the South Annex in August 2023.

209.

Drug use in the Jail includes the use of "strips"—pieces of paper soaked in chemicals and unknown substances, then dried and smoked for narcotic effect. One incarcerated person told the DOJ that strips bring "chaos" to the housing units, likening the ensuing violence to war.

210.

Drug use plays a clear role in violence at the Jail.

211.

In March 2023, an officer observed a fight between two incarcerated people. One was incoherent and unable to be interviewed after the fight, due to his "high

level of drug usage." The other person involved said he had been defending himself from attack.

### 212.

In another incident in March of 2023, multiple people assaulted and stabbed a person who was so high that he could not stand up or walk straight.

### 213.

According to the DOJ findings, the Jail has inadequate systems for identifying, investigating, and preventing violence.

### 214.

Given the amount of violence at the Jail, procedures to identify dangerous circumstances and investigate misconduct are critical. The Jail does not meaningfully respond to grievances and complaints from incarcerated people, does not investigate the root causes of violence in the Jail, and does not implement corrective action plans to improve safety.

### 215.

According to the DOJ, the Jail's grievance system does not offer incarcerated people an adequate way to report and avoid danger.

### 216.

The Jail grievance coordinator admitted that most grievances raise safety concerns.

217.

The DOJ's review of the Jail's responses to grievances revealed gross deficiencies.

218.

The DOJ reviewed many grievances with serious complaints, to which jail staff responded by stating that the incarcerated person needed to direct their issue to another staff member or file the grievance again on another type of form. This kind of response improperly avoids investigating and substantively responding to a person's grievance, and risks missing opportunities to address unsafe conditions.

219.

One homicide victim submitted 13 grievances in August 2023, the month he died. In five of these grievances, he reported experiencing violence from other people at the Jail. In a grievance submitted shortly before he was moved to 7 South, he reported that officers were trying to move him to a more dangerous location because he had reported them for misconduct. He explained that moving him was dangerous because he had had issues with people on multiple other floors. The grievance officer did not respond until a month later, at which point the officer wrote: "[T]his grievance is over 30 days old. If your issue is still unresolved, please re-submit your complaint. This office apologizes for the delay." By the time of this response, the person had already been moved to 7 South and killed there.

220.

According to the DOJ, grievances about violence are routinely ignored at the Jail.

221.

In August 2023, an incarcerated person submitted an emergency grievance alleging that he was assaulted that day by another person in his zone. He further alleged that his assailant had assaulted someone else two days before the attack, and that officers had failed to remove the assailant from the zone. The grievance officer decided the grievance was improperly filed as an emergency, told the person to refile on a general grievance form, and closed it.

222.

According to the DOJ, the Jail does not use quality investigations and corrective action planning to identify dangerous situations and avoid violence.

223.

The DOJ also found no evidence that the Jail conducts meaningful investigations into security lapses after violent deaths in the Jail.

224.

For example, the DOJ found no investigation into potential security failures related to the homicide of a person on the mental health unit in 2022, even though the assailant in that case had been arrested just two weeks before for a serious

stabbing outside the Jail in which the victim later died. A proper investigation may have identified corrective actions related to classification and housing assignments, and may have determined that the assailant should not have been in the mental health unit or had a cellmate. But the DOJ found no record of any such investigation.

225.

According to the DOJ, the Jail is hazardous and unsanitary.

226.

Jail housing units are full of flooded water from broken toilets and sinks.

227.

Cockroaches, rodents, and other pests abound, and the Jail takes insufficient steps to control infestations.

228.

Cells and common areas at the Jail are filthy and unhygienic with dangerous exposed wires.

229.

The Jail does not provide enough food, and food preparation and distribution services are not sanitary.

230.

The above-described conditions make the Jail unsafe; people incarcerated in the Jail have suffered from pest infestations, malnourishment, and other harms due to these conditions.

231.

According to the DOJ, the Jail fails to maintain clean, hygienic, and safe conditions.

232.

Poor Jail conditions have contributed to serious injuries from accidents, allowed the spread of pests and pathogens, and put incarcerated people at risk of serious harm.

233.

Widespread and persistent plumbing failures create safety hazards and health risks. Many cells and dayrooms are filled with large pools of flooded water that can lead to the growth of mold and other pathogens.

234.

In recent years, at least two incarcerated people have been hospitalized after slipping and falling in these water pools, including a 17-year-old who sustained a "gaping wound" to his leg and a man who received a laceration and possible fracture to the back of his head. Another man was discovered lying in cold water on his cell floor; his skin was cold and he was found to have hypothermia.

235.

In August 2024, a County inspection of four housing units found 33 cells with broken sinks.

236.

Leaks in Jail pipe chases are also a systemic problem. The DOJ observed leaking pipes in most of the pipe chases it inspected, many of which had large pools or deep standing water because of prolonged leaks. The water often seeped through the walls into adjacent cells. The DOJ observed incarcerated people trying to mop up the pooled pipe chase leaks in their cells with bedding, clothing, and linens.

237.

Showers and shower door frames at the Jail are full of mold, dirt, and peeling paint and shower curtains are improperly hung up by strings, posing a security and safety risk.

238.

Drains in showers, padded cells, and individual sinks at the Jail are full of dirt and debris. The drains in some of the padded cells—which function as toilets—had trash and apparent human waste in them, and several padded cells smelled strongly of feces. One padded cell also appeared to have fecal matter on the ceiling and walls.

239.

Individual cells at the Jail are dirty and unsanitary and appear not to be cleaned for long periods of time, if at all.

240.

Cell sinks at the Jail contain so much dirt and grime that many are unsafe for use.

241.

Toilets at the Jail are filthy, and the DOJ observed clothing items in them, indicating unsafe self-laundering practices.

242.

The bunks on which incarcerated people sleep at the Jail are rusty and had dirt and debris on the platform where the mattress sits, allowing for bacterial growth and facilitating the spread of harmful pathogens.

243.

According to the DOJ, air quality and ventilation in housing units at the Jail is poor.

244.

Ceilings in housing areas at the Jail are covered in dust, mold, and mildew.

245.

Air vents are dirty and blow dust and debris onto ceiling tiles in housing areas. The vents in cells are rusted and contain debris, and others are obstructed with paper.

246.

There are exposed wires throughout the Jail, including in dayrooms, cells, and pipe chases. The exposed wires and the ways people use them are an electrical hazard and a fire hazard.

247.

One incident report described an officer receiving an electric shock from exposed wires. A medical provider noted that a person with serious mental illness had pulled wires out of a wall and talked about electrocuting himself.

248.

According to the DOJ, the Jail has poor parasite and pest control.

249.

The Jail is infested with lice, cockroaches, rodents, and other pests, and takes inadequate steps to control them.

250.

Rodents and insects carry bacteria and diseases that can be transmitted to humans through bites, exposure to their urine and feces, and contamination of food

or surfaces. Such pests have infested the bodies of people at the Jail, making them sick or causing them significant pain and discomfort.

251.

In 2023, there were an average of 48 ectoparasite cases per month at the Jail.

252.

The Jail lacks adequate chemical control to prevent against misuse and ensure safety.

253.

Controlling the use of and exposure to chemicals, including cleaning and disinfecting chemicals, is critical to protect incarcerated people from harm.

254.

The Jail lacks appropriate and safe chemical control practices, and it fails to store or handle chemicals in a manner that controls access and prevents misuse. As a result, incarcerated people have easy access to dangerous, high-concentration chemicals that they have used to harm themselves and others, leading to serious and life-threatening injuries.

255.

Food at the Jail is insufficient and nutritionally inadequate, and food preparation and delivery services are unsafe.

256.

According to a DOJ report, 90% of people living in a mental health unit of the Jail were "significantly malnourished with obvious muscle wasting."

257.

According to a DOJ report, the food the Jail provides is nutritionally inadequate.

258.

According to a DOJ report, food preparation and delivery services are also unsafe at the Jail. The kitchen facilities and loading dock where food enters the kitchen are unclean, with cockroach and rodent infestations

259.

In addition, according to a DOJ report, food prepared in the kitchen is not prepared or kept at safe temperatures.

260.

According to the DOJ, Fulton County and the Fulton County Jail fail to provide constitutionally adequate medical and mental health care to people at the Jail.

261.

According to the DOJ, gross deficiencies in the Jail's provision of medical and mental health care expose incarcerated people to an increased risk of injury, serious illness, pain and suffering, mental health decline, and death.

262.

According to the DOJ, unsafe Jail conditions restrict access to medical and mental health care and lead to constitutionally deficient care.

263.

The conditions in the Jail—including high levels of violence, poor supervision, poor management, and an inadequately maintained facility—unreasonably impede incarcerated people with serious medical and mental health needs from accessing necessary care.

264.

Jail officials are aware of the inadequate medical and mental health care in the Jail but have failed to take reasonable measures to improve care.

265.

In 2023, the Jail's healthcare provider, NaphCare, notified officials with the County and Sheriff's Office that the substantial safety and security risks at the Jail impede access to care.

266.

In March 2023, the NaphCare CEO stated in a letter to the Sheriff, the Chairman of the Fulton County Board of Commissioners, the Fulton County Manager, and the County's Chief Operating Officer, that Fulton County Jail was "the most dangerous jail or prison facility where NaphCare is contracted to provide

services in any location in the Country." He described the environment in which

healthcare providers work as "not adequately safe and secure," and cited healthcare

staff resignations due to "safety-related concerns."

267.

In April 2023, NaphCare notified the Sheriff that it intended to terminate the

healthcare contract because "despite . . . numerous requests to leadership,

conditions have worsened," and because of the need to "operate in a clean and safe

environment."

268.

Conditions in the Jail continue to obstruct the delivery of medical and

mental health care. The impacts include medical and mental health services at the

Jail being put on hold because of a lack of custody staff, and patients missing

appointments with physicians and nurses.

269.

Poor technological infrastructure also impedes access to healthcare at the

Jail.

270.

NaphCare's electronic medical records system relies on information from

the Jail's data management system to locate patients and provide them with

necessary medications and care. But the Jail's data management system has failed

on multiple occasions, showing, for instance, that people who are still incarcerated have been released.

271.

As a result, healthcare staff trying to access some patient medical records cannot do so; at other times, providers go to one location in the Jail to find patients, only to learn they are housed somewhere else.

272.

Frequent power outages at the Jail further impede NaphCare's data systems. These outages have disrupted the delivery of care to incarcerated people at the Jail for long periods of time.

273.

Security and staffing problems affect all aspects of healthcare in the Jail, including medication administration, sick calls, and specialty care. They create unsafe or hazardous conditions in housing units that result in cancelled and delayed care.

274.

According to the DOJ, inadequate medical care at the Jail exposes incarcerated people to a substantial risk of serious harm, including death.

275.

According to the DOJ, the Jail fails to provide adequate treatment including referrals, testing, and follow-up care.

276.

According to the DOJ, the Jail's medication administration puts incarcerated people at substantial risk of serious harm.

277.

Jail and medical staff also fail to take adequate measures to ensure that people on the unit know that medication administration is occurring. As a result, people reported missing medication administration because they were asleep, using the bathroom, or did not hear the medication administration announcement due to a hearing impairment.

278.

Medication administration records at the Jail were incomplete and unclear during DOJ visits.

279.

Medication administration records must document whether the patient took the medication, and if they did not take the medication, the reason why not—whether due to refusal, medication administration disruption, unavailability of medication, or some other reason. But medication administration records from the

Jail often fail to provide any reason at all when someone does not take their

prescribed medication.

280.

When medication is not dispensed and the records do not make clear if

someone refused medication or if the medication was not provided, healthcare

providers cannot effectively intervene to ensure patients receive medications

necessary for their health.

281.

Safe medication administration requires that medical staff dispensing

medications verify the identity of the person to whom they are providing

medication.

282.

But, according to the DOJ, Jail staff dispensing medications do not

consistently verify patients' identities before dispensing medication. This creates a

risk for someone to come to the medication cart when another's person name is

announced and receive the other person's medications.

283.

According to the DOJ, the Jail's failure to provide adequate medical care

inside the Jail includes failure to provide confidential healthcare screening, failure

to provide sick call slips and respond to sick call requests promptly, failure to

provide adequate treatment and monitoring for people withdrawing from substance

use, failure to provide access to physical therapy services and supportive medical

equipment when needed, and inadequate language interpretation services.

284.

According to the DOJ, the Jail fails to provide appropriate medical aid in

life-or-death situations.

285.

According to the DOJ, conditions in the Jail's medical housing put people

with serious medical needs at risk.

286.

According to the DOJ, people with mental health needs experience poor Jail

conditions and deficient mental health care.

287.

A majority of the people who have died in the Jail in recent years had a

mental illness. The DOJ found that 75% of those who died in the Jail since January

2021 had a current mental health diagnosis or reported a history of mental illness.

288.

According to the DOJ, conditions on the mental health unit in the Jail remain

poor.

289.

Recent County inspections of the mental health unit documented one housing zone where both showers were inoperable, and a "foul-smelling odor" in another zone caused by pooling water that had been an issue for months.

290.

In June 2024, inspectors found that ten cells in the mental health unit had broken lights.

291.

In some zones on the mental health unit, people are locked down and held in isolation for 23 hours a day in these conditions.

292.

Problems in the mental health units are exacerbated by a culture among custody officers where mental health issues are deprioritized.

293.

Incarcerated people told the DOJ during a DOJ investigation that custody staff disregard mental health complaints and requests for treatment.

294.

Mental health staff reported repeat instances where custody staff would not respond appropriately to concerns.

295.

The cumulative effect of poor physical conditions, security problems, and a culture of disregard is an environment in which mental health needs go unmet and serious mental health conditions are exacerbated.

296.

According to the DOJ, the Jail does not provide adequate treatment to people with mental health needs.

297.

Necessary mental-health-related interventions, treatment, and rehabilitative services are mostly unavailable at the Jail, even for people with mental health needs residing in specialized housing.

298.

Professionals responsible for mental health treatment in the Jail are unable to provide services that meet minimum standards.

299.

The Jail's contract with NaphCare requires that NaphCare provide people with mental health disabilities "psychosocial and medication therapies," and "individual or group therapy as indicated," in order "to relieve symptoms, achieve a level of appropriate functioning and prevent a relapse." But record review and interviews with Jail staff, mental health staff, detained people and advocates confirmed that such services are unavailable in the Jail.

300.

Non-clinical mental health staff document educating patients about their mental health conditions, but not providing them therapy. Mental health staff described their services as limited to crisis stabilization and medication management.

301.

Responses to requests for mental health care are often delayed because officers are unavailable to escort mental health staff to see patients.

302.

The check-ins mental health staff provide to people with mental health needs throughout the Jail are brief and superficial. "Cell-side" check-ins, lasting about five minutes and with limited or no confidentiality, are common. Some check-ins happen in public view while the mental health provider stands in the hallway at the entrance to a housing zone.

303.

According to the DOJ, Incarcerated people in specialized mental health units lack access to minimally adequate mental health care.

304.

People on 3 North—the housing unit for those with mental health needs— generally receive the same low level of mental health care they would receive if

they were housed in general population. This includes medications and the

possibility of a brief check-in with a member of the mental health staff. But even

medication and monitoring/check-ins are frequently unavailable or disrupted.

305.

Mental health staff told the DOJ it was not safe to have groups at the Jail

given the lack of custody staff, and so there is no group therapy provided.

306.

There are not enough psychiatric staff to meet the needs of the incarcerated

population at the Jail.

307.

There is only one full-time psychiatrist for the Jail who is supported by a

part-time psychiatrist and several psychiatric nurse practitioners. Given the

significant mental health needs of the Jail population, this is not sufficient

psychiatry staffing.

308.

According to the DOJ, poor discharge planning at the Jail puts people with

serious mental health needs at risk of harm.

309.

According to the DOJ, inadequate mortality reviews, psychological

autopsies, and oversight practices at the Jail fail to correct deficient care.

310.

The Jail's medical provider conducts morbidity and mortality reviews following deaths at the Jail, but they are cursory and fail to identify care deficiencies.

311.

Additionally, the County and Sheriff's Office do not closely monitor NaphCare's services in the Jail to ensure adequate healthcare is provided.

312.

The Sheriff's Health Program Manager monitors NaphCare's services by reviewing staff vacancies— NaphCare credits money back to the County that is not used because of understaffing—and by attending regular meetings with healthcare providers. Some corrective actions are identified and discussed during these meetings, but the Health Program Manager does not track them to make sure they are put in place, and she does not assess the adequacy of the contractor's medical care.

313.

The Health Program Manager's background is in mental health, yet she does not monitor NaphCare's provision of mental health services in the Jail.

314.

The overcrowding of the Fulton County Jail has been the most highlighted and utilized problem cited by county officials for inmate deaths and assaults since it was built. The overcrowding issues began as soon as the jail opened in 1989, as the facility was not built large enough for the inmate population at the time. That problem continues until today.

315.

At a Board of Commissioners meeting in May 2022, the Sheriff reported that due to overcrowding, there were 366 people sleeping in temporary beds on the floor of the Jail.

316.

In a July 2022 Board of Commissioners meeting, the Sheriff advised that the total population in the Jail was about to reach 3,400, an increase of 600 from the year before, and a Fulton County Commissioner described the overcrowding in the Jail as "inhumane."

317.

At a Board of Commissioners meeting in April 2023, one Commissioner stated, "[T]he jail is a crisis, it's in a crisis situation."

318.

An August report from the Justice Policy Board (JPB) found the Fulton County jail population has steadily increased over the last five years due to procedures and policies that have driven the current overcrowding crisis.

319.

The JPB was formed in 2022 as part of an agreement between Atlanta and Fulton County. Atlanta agreed to allow Fulton County to use a portion of the city detention center for diversion services to help relieve overcrowding in the Fulton County Jail. A jail population study, covering the last five years, was also part of the agreement. The report stated 3,462 people were jailed in Fulton County in 2023 for charges that were eligible for diversion. In the 250 reviewed cases, at least 75 people were in custody due to a bond of $15,000 or less. One person spent nearly 500 days in jail because he could not pay bond. The report states 38% (4,886) of all bookings this year were for people charged with misdemeanors as their most serious charge. That percentage has held steady since 2018.

320.

The Committee also reviewed cases among people detained without violent offenses in their Fulton booking history, others clinically diagnosed with at least mild depression, and people booked for non-violent offenses at least three times within 24 months. Those people accounted for more than one-third of the bookings, and they spent an average of 143 days behind bars this year. In 250 cases, 35% of

the inmates had delayed releases due to acute mental health or housing needs. One

person charged with loitering has been in custody for over 310 days, according to

the report. The report also called out issues in the data Fulton provided, such as an

undercount in jail releases from 2016 to 2018, incomplete data on prior bookings,

and "potential unreliability" in bond data.

321.

In November 2023, reports surfaced about misuse of the Jail's Inmate Welfare

Fund. The Fund comes from money incarcerated people and their families spend on

phone calls and commissary items (such as food, clothing, and hygiene items), and,

by County law, was to be used for the welfare of the incarcerated population. Instead,

money intended to benefit the incarcerated population went to staff benefits (e.g.,

Honey Baked Ham gift cards and a bounce house rental), community events,

vehicles, and Tasers.

322.

In response, the Board of Commissioners abolished the Inmate Welfare Fund

and the Sheriff's Office lost direct access to millions of dollars that had been

reserved for the incarcerated population's benefit.

323.

The U.S. Constitution imposes duties on jail officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

324.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

325.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

326.

As demonstrated above, the Jail is perhaps the most dangerous county jail in Georgia, and the violations of inmate's federally protected rights is so widespread, persistent, and pervasive that a federal investigation determined that Fulton County Jail is structurally unsafe and that prevalent violence has resulted in serious injuries and homicides.

327.

Violence and terror reign at the Fulton County Jail to such an extent that Francis Wabibi's death at the hands of his cellmate is actionable under clearly established federal law.

328.

Fulton County and Sheriff Labat had actual and constructive knowledge of widespread, persistent pattern of inmate-on-inmate violence at the jail.

329.

Defendants Sheriff Patrick Labat, Individually, Defendant Richardson, Individually, Detention Officer S. Tilley, Individually, Captain Jamarl Johnson, Individually, and Cadet Deputy Anthony Okonkwo, Individually, are not entitled to qualified immunity because they violated Francis Wabibi's clearly established constitutional rights under cases such as *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003).

330.

The Fulton County Board of Commissioners have failed to adequately fund the Fulton County Jail to provide sufficient space and safety for the inmates housed there.

331.

Sheriff Labat has failed to properly manage the budget provided to him.

332.

The Fulton County Board of Commissioners have a longstanding public feud regarding the amount of the budget provided to the Sheriff and the Sheriff's management of the budget he receives.

333.

Sheriff Labat and Fulton County have instituted a policy of widespread constitutional deprivations at the Fulton County Jail resulting in unacceptable and unconstitutional levels of inmate-on-inmate violence.

334.

Sheriff Labat and Fulton County are aware of the substantial risk of danger the Fulton County Jail poses to inmates, but they have been deliberately indifferent to such risks.

335.

The budgeting issues at the Fulton County Jail, attributable to both Fulton County and Sheriff Labat, has resulted in unreasonably dangerous overcrowding, understaffing, poor training of jail staff, poor recruitment, widespread contraband and scandal, and widespread violence and constitutional deprivations at the Fulton County Jail.

336.

The widespread pattern of constitutional deprivations at Fulton County Jail led directly to the death of Francis Wabibi.

337.

Detention Officer S. Tilley, individually, and Cadet Deputy Anthony Okonkwo were deliberately indifferent to the risk posed to Francis Wabibi and failed to keep him reasonably safe by conducting sufficient security rounds, thus allowing Francis Wabibi to be tied up and beaten to death in his cell without any assistance being provided to him by those tasked with ensuring his safety at the jail.

338.

Sheriff Labat and Captain Johnson are liable to Plaintiffs in their supervisory capacity for the death of Francis Wabibi.

## COUNT I

### Section 1983 Claim under Fourteenth & Eighth Amendments: Pattern of Violations of Substantive Due Process; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment Against Fulton County, Georgia, and Sheriff Labat under *Monell*

339.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-338 of the instant Complaint as if fully set forth herein verbatim.

340.

Defendant Fulton County, Georgia, is the policy maker for determining the budget of the Fulton County Sheriff's Office.

341.

Sheriff Patrick Labat is the elected Sheriff of Fulton County, Georgia, holding office by virtue of the constitution and laws of the State of Georgia, and was acting in the course and scope of his employment and under the color of law at all times relevant hereto and is sued herein in his individual capacity for purposes of his actions and policies and training of law enforcement personnel under his control and supervision and for establishing a policy or pattern of widespread constitutional deprivations at the Fulton County Jail.

342.

Sheriff Patrick Labat is the Policy Maker for the Fulton County Sheriff's Office.

343.

Francis Wabibi had a right to be protected from cruel and unusual punishment under the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is analyzed under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented the Defendants from exercising deliberate indifference toward Francis Wabibi's safety, security, and constitutional rights.

344.

Unconstitutional hiring, training, supervision, policies, customs, and or practices related to the handling of detainees and or arrestees at Fulton County Jail include but are not limited to:

a. The Fulton County Jail does not adequately protect incarcerated people from a substantial risk of serious harm from violence by other incarcerated people inside its facilities.

b. The Jail exposes incarcerated people to extreme violence and the risk of serious harm.

c. Killings, stabbings, and assaults are common in the Jail.

d. The Jail fails to protect vulnerable populations, including people with serious mental illness, from violence.

e. The Jail does not house people appropriately to reduce the risk of violence.

f. The Jail's deficient classification system and housing plan increase the risk of violence.

g. The Jail does not use housing assignments to effectively mitigate the risk of gang violence.

h. The Jail does not provide adequate staffing and supervision to keep people safe.

i.  Poor maintenance and pervasive contraband contribute to the violence and unmaintained parts of the Jail jeopardize safety.

j.  Poor door security in the Jail threatens the lives of incarcerated people.

k.  Drug use is common at the Jail and leads to violence.

l.  The Jail does not take appropriate measures to prevent the movement of contraband into and around its facilities.

m.  The Jail has inadequate systems for identifying, investigating, and preventing violence.

n.  The Jail's grievance system does not offer incarcerated people an adequate way to report and avoid danger.

o.  The Jail does not use quality investigations and corrective action planning to identify dangerous situations and avoid violence.

p.  The Jail is hazardous and unsanitary and the Jail fails to maintain clean, hygienic, and safe conditions.

q.  The Jail has poor parasite and pest control.

r.  The Jail lacks adequate chemical control to prevent against misuse and ensure safety.

s.  Food at the Jail is insufficient and nutritionally inadequate, and food preparation and delivery services are unsafe.

t. Fulton County and the Fulton County Jail fail to provide constitutionally adequate medical and mental health care to people at the Jail.

u. Unsafe Jail conditions restrict access to medical and mental health care and lead to constitutionally deficient care.

v. Inadequate medical care exposes incarcerated people to a substantial risk of serious harm, including death.

w. The Jail fails to provide adequate treatment including referrals, testing, and follow-up care.

x. The Jail's medication administration puts incarcerated people at substantial risk of serious harm.

y. The Jail's failure to provide adequate medical care inside the Jail includes failure to provide confidential healthcare screening, failure to provide sick call slips and respond to sick call requests promptly, failure to provide adequate treatment and monitoring for people withdrawing from substance use, and failure to provide access to physical therapy services and supportive medical equipment when needed,

z. The Jail fails to provide appropriate medical aid in life-or-death situations.

aa. Conditions in the Jail's medical housing put people with serious medical needs at risk

bb. People with mental health needs experience poor Jail conditions and deficient mental health care and the Jail environment is harmful to people with mental health needs.

cc. The Jail does not provide adequate treatment to people with mental health needs.

dd. Inadequate mortality reviews, psychological autopsies, and oversight practices fail to correct deficient care.

### 345.

Insufficient hiring, training, supervision, policies, customs, and or practices related to the handling of detainees and or arrestees, and failure of Defendants to take reasonable measures to prevent the conduct that is complained of herein, constituted a deliberate indifference to the safety, security, and rights of Francis Wabibi and exposed Francis Wabibi to unreasonable risks of harm.

### 346.

Insufficient hiring, training, supervision, policies, customs, and or practices related to the handling of detainees and or arrestees, and failure of Defendants to

take reasonable measures to prevent the conduct that is complained of herein directly caused the injuries and death that Mr. Wabibi suffered from.

347.

The U.S. Constitution imposes duties on jail officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

348.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

349.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

350.

As demonstrated above, the Jail is perhaps the most dangerous county jail in Georgia, and the violations of inmate's federally protected rights is so widespread, persistent, and pervasive that a federal investigation determined that Fulton County

Jail is structurally unsafe, that prevalent violence has resulted in serious injuries and homicides.

351.

Violence and terror reign at the Fulton County Jail to such an extent that Francis Wabibi's death at the hands of his cellmate is actionable under clearly established federal law.

352.

Fulton County and Sheriff Labat had actual and constructive knowledge of widespread, persistent pattern of inmate-on-inmate violence as well as of the other constitutional violations described herein.

353.

The Fulton County Board of Commissioners have failed to adequately fund the Fulton County Jail to provide sufficient space and safety for the inmates housed there.

354.

Sheriff Labat has failed to properly manage the budget provided to him.

355.

The Fulton County Board of Commissioners have a longstanding public feud regarding the amount of the budget provided to the Sheriff and the Sheriff's management of the budget he receives.

356.

Sheriff Labat and Fulton County have instituted a policy of widespread constitutional deprivations at the Fulton County Jail resulting in unacceptable and unconstitutional levels of inmate-on-inmate violence.

357.

Sheriff Labat and Fulton County are aware of the substantial risk of danger the Fulton County Jail poses to inmates, but they have been deliberately indifferent to such risks.

358.

The budgeting issues at the Fulton County Jail, attributable to both Fulton County and Sheriff Labat, has resulted in unreasonably dangerous overcrowding, understaffing, poor training of jail staff, poor recruitment, widespread contraband and scandal, and widespread violence and constitutional deprivations at the Fulton County Jail.

359.

The widespread pattern of constitutional deprivations at Fulton County Jail lead directly to the death of Francis Wabibi.

360.

Wherefore, Plaintiffs are entitled to recover under Section 1983 against Sheriff Labat and Fulton County, Georgia.

361.

As a result of the constitutional deprivations described herein, Mr. Wabibi suffered physical and mental pain and suffering, serious bodily injury, extreme mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

## COUNT II

**Section 1983 Claims under Fourteenth and Eighth Amendments: Violation of Substantive Due Process; Deliberate Indifference to Known, Substantial Risk of Serious Harm ; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment Against Lieutenant Antonio Richardson, Individually**

362.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-104 of the instant Complaint as if fully set forth herein verbatim.

363.

Defendant Richardson knowingly failed to take reasonable steps to protect Mr. Wabibi from violence at the hands of another inmate who posed a substantial risk of serious harm to Mr. Wabibi because, among other things, Defendant

Richardson placed Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi. This is evidenced by, among other things:

    a. Mr. Wabibi's and Loosecase Simeon Keith Lucas's weight differential of 65 pounds,

    b. Loosecase Simeon Keith Lucas's violent criminal past/charges as compared to Mr. Wabibi's non-violent loitering charges,

    c. Loosecase Simeon Keith Lucas's violent proclivities and reputation,

    d. Mr. Wabibi's uncontrolled mental health and unusual behavior which angered previous roommates,

    e. Mr. Wabibi's prior victimization from former inmates in Incident 1 as well as Incident 2.

364.

Defendant Richardson possessed subjective knowledge that by placing Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas, he was placing Mr. Wabibi at a substantial risk of serious harm as evidenced by, among other things:

    a. Mr. Wabibi's and Loosecase Simeon Keith Lucas's weight differential of 65 pounds,

    b. Loosecase Simeon Keith Lucas's violent criminal past/charges as compared to Mr. Wabibi's non-violent loitering charges,

Page **84** of **115**

   c. Loosecase Simeon Keith Lucas's violent proclivities and reputation,

   d. Mr. Wabibi's uncontrolled mental health and unusual behavior which angered previous roommates,

   e. Mr. Wabibi's prior victimization from former inmates in Incident 1 as well as Incident 2.

365.

In spite of this knowledge of certain danger, Defendant Richardson was deliberately indifferent to it, failed to reasonably respond to the risks as well as failed to protect Mr. Wabibi, and transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision.

366.

Defendant Richardson's failure to take reasonable action to protect Mr. Wabibi from known risks of serious harm amounted to deliberate indifference and failure to protect in violation of the Fourteenth and Eighth Amendments and proximately caused Mr. Wabibi physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

367.

Defendant Richardson also had a sufficiently culpable state of mind to be deliberately indifferent and his conduct amounted to more than mere negligence because in the face of the known threats that possessed a strong likelihood of occurring, he not only ignored the warning signs, but he transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision and allowed the Attack to happen.

368.

The conditions at Fulton County Jail were extreme and posed an unreasonable risk of serious injury to Mr. Wabibi's health or safety as evidenced by, among other things, the numerous murders and assaults at Fulton County Jail.

369.

There was a generalized risk of serious harm to Mr. Wabibi, because serious inmate-on-inmate violence was the norm or something close to it as evidenced by, among other things, the numerous assaults and murders at Fulton County Jail.

370.

There was an affirmative causal connection between Defendant Richardson's acts and omissions and deliberate indifference to Mr. Wabibi's safety.

371.

Defendant Richardson is not entitled to qualified immunity because he violated Francis Wabibi's clearly established constitutional rights under cases such as *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), and *Farmer v. Brennan*, 511 U.S. 825, 833 (1994),

372.

As a result of the deliberate indifference as well as the failure to protect described herein, Mr. Wabibi suffered physical and mental pain and suffering, serious bodily injury, extreme mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

## COUNT III

### Section 1983 Claims under Fourteenth & Eighth Amendments: Violation of Substantive Due Process; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment Against Detention Officer S. Tilley, individually,

373.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-104 of the instant Complaint as if fully set forth herein verbatim.

374.

Detention Officer S. Tilley, individually was deliberately indifferent to the risk posed to Francis Wabibi and failed to keep him reasonably safe by conducting sufficient security rounds, thus allowing Francis Wabibi to be tied up and beaten to death in his cell without any assistance being provided to him by those tasked with ensuring his safety at the jail.

375.

Defendant Tilley knowingly failed to take reasonable steps to protect Mr. Wabibi from violence at the hands of another inmate who posed a substantial risk of serious harm to Mr. Wabibi because, among other things, Defendant Tilley placed Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi and failed to keep him reasonably safe by conducting sufficient security rounds, thus allowing Francis Wabibi to be tied up and beaten to death in his cell without any assistance being provided to him by those tasked with ensuring his safety at the Jail.

376.

Defendant Tilley possessed subjective knowledge that by placing Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas and by failing to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds, she was placing Mr. Wabibi at a substantial risk of serious harm as evidenced by, among other things:

a. Mr. Wabibi's and Loosecase Simeon Keith Lucas's weight differential of 65 pounds,

b. Loosecase Simeon Keith Lucas's violent criminal past/charges as compared to Mr. Wabibi's non-violent loitering charges,

c. Loosecase Simeon Keith Lucas's violent proclivities and reputation,

d. Mr. Wabibi's uncontrolled mental health and unusual behavior which angered previous roommates,

e. Mr. Wabibi's prior victimization from former inmates in Incident 1 as well as Incident 2.

377.

In spite of this knowledge of certain danger, Defendant Tilley was deliberately indifferent to it, transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision, failed to reasonably respond to the risk, failed to protect Mr. Wabibi as well as failed to keep him reasonably safe by conducting sufficient security rounds.

378.

Defendant Tilley's failure to take reasonable action to protect Mr. Wabibi from known risks of serious harm amounted to deliberate indifference and failure to protect in violation of the Fourteenth and Eighth Amendments and proximately

caused Mr. Wabibi physical and mental pain and suffering, extreme mental distress, serious bodily injury, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

379.

Defendant Tilley also had a sufficiently culpable state of mind to be deliberately indifferent and his conduct amounted to more than mere negligence because in the face of the known threats that possessed a strong likelihood of occurring, she not only ignored the warning signs, but she transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision, allowed the Attack to happen, and failed to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds.

380.

The conditions at Fulton County Jail were extreme and posed an unreasonable risk of serious injury to Mr. Wabibi's health or safety as evidenced by, among other things, the numerous murders and assaults at Fulton County Jail.

381.

There was a generalized risk of serious harm to Mr. Wabibi, because serious inmate-on-inmate violence was the norm or something close to it as evidenced by, among other things, the numerous assaults and murders at Fulton County Jail.

382.

There was an affirmative causal connection between Defendant Tilley's acts and omissions and deliberate indifference to Mr. Wabibi's safety.

383.

Defendant Detention Officer S. Tilley, individually is not entitled to qualified immunity because she violated Francis Wabibi's clearly established constitutional rights under cases such as *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), and *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

384.

As a result of the deliberate indifference as well as the failure to protect described herein, Mr. Wabibi suffered physical and mental pain and suffering, serious bodily injury, extreme mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

## COUNT IV

**Section 1983 Claims under Fourteenth & Eighth Amendments: Violation of Substantive Due Process; Deliberate Indifference to Known Substantial Risk of Serious Harm; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment Against Cadet Deputy Anthony Okonkwo, individually**

385.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-104 of the instant Complaint as if fully set forth herein verbatim.

386.

Cadet Deputy Anthony Okonkwo, individually was deliberately indifferent to the risk posed to Francis Wabibi and failed to keep him reasonably safe by conducting sufficient security rounds, thus allowing Francis Wabibi to be tied up and beaten to death in his cell without any assistance being provided to him by those tasked with ensuring his safety at the jail.

387.

Cadet Deputy Anthony Okonkwo knowingly failed to take reasonable steps to protect Mr. Wabibi from violence at the hands of another inmate who posed a substantial risk of serious harm to Mr. Wabibi because, among other things, Cadet Deputy Anthony Okonkwo placed Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi and failed to keep him reasonably safe by conducting sufficient security rounds, thus allowing Francis Wabibi to be tied up and beaten to death in his cell without any assistance being provided to him by those tasked with ensuring his safety at the jail.

388.

Cadet Deputy Anthony Okonkwo possessed subjective knowledge that by placing Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas and by failing to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds, he was placing Mr. Wabibi at a substantial risk of serious harm as evidenced by, among other things:

    a.  Mr. Wabibi's and Loosecase Simeon Keith Lucas's weight differential of 65 pounds,

    b.  Loosecase Simeon Keith Lucas's violent criminal past/charges as compared to Mr. Wabibi's non-violent loitering charges,

    c.  Loosecase Simeon Keith Lucas's violent proclivities and reputation,

    d.  Mr. Wabibi's uncontrolled mental health and unusual behavior which angered previous roommates,

    e.  Mr. Wabibi's prior victimization from former inmates in Incident 1 as well as Incident 2.

389.

In spite of this knowledge of certain danger, Cadet Deputy Anthony Okonkwo was deliberately indifferent to it, transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision, failed to reasonably respond to the risk, failed to protect Mr. Wabibi as well as failed to keep him reasonably safe by conducting sufficient security rounds.

390.

Cadet Deputy Anthony Okonkwo's failure to take reasonable action to protect Mr. Wabibi from known risks of serious harm amounted to deliberate indifference and failure to protect in violation of the Fourteenth and Eighth Amendments and proximately caused Mr. Wabibi physical and mental pain and suffering, serious bodily injury, extreme mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

391.

Cadet Deputy Anthony Okonkwo also had a sufficiently culpable state of mind to be deliberately indifferent and his conduct amounted to more than mere negligence because in the face of the known threats that possessed a strong likelihood of occurring, he not only ignored the warning signs, but he transferred Mr. Wabibi into a cell with Loosecase Simeon Keith Lucas with little to none supervision, allowed the Attack to happen, and failed to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds.

392.

The conditions at Fulton County Jail were extreme and posed an unreasonable risk of serious injury to Mr. Wabibi's health or safety as evidenced by, among other things, the numerous murders and assaults at Fulton County Jail.

393.

There was a generalized risk of serious harm to Mr. Wabibi, because serious inmate-on-inmate violence was the norm or something close to it as evidenced by, among other things, the numerous assaults and murders at Fulton County Jail.

394.

There was an affirmative causal connection between Cadet Deputy Anthony Okonkwo's acts and omissions and deliberate indifference to Mr. Wabibi's safety.

395.

Cadet Deputy Anthony Okonkwo, individually is not entitled to qualified immunity because he violated Francis Wabibi's clearly established constitutional rights under cases such as *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003), *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312 (11th Cir. 2016), and *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

396.

As a result of the deliberate indifference as well as the failure to protect described herein, Mr. Wabibi suffered physical and mental pain and suffering, serious bodily injury, extreme mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

## COUNT V

### Section 1983 Claim under Fourteenth & Eighth Amendments: Violation of Substantive Due Process; Failure to Take Reasonable Measures to Guarantee Safety; Cruel and Unusual Punishment; Failure to Train and Supervise Against Sheriff Labat and Captain Johnson under *Canton*

397.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-338 of the instant Complaint as if fully set forth herein verbatim.

398.

According to the Supreme Court,

It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

399.

Sheriff Patrick Labat is the elected Sheriff of Fulton County, Georgia, holding office by virtue of the constitution and laws of the State of Georgia, and was acting in the course and scope of his employment and under the color of law at all times relevant hereto and is sued herein in his individual capacity for purposes of his actions and policies and training of law enforcement personnel under his control and

supervision and for establishing a policy or pattern of widespread constitutional deprivations at the Fulton County Jail.

400.

Sheriff Patrick Labat is the Policy Maker for the Fulton County Sheriff's Office.

401.

Francis Wabibi had a right to be protected from cruel and unusual punishment under the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is analyzed under the Eighth Amendment right to be free from cruel and unusual punishment and the unreasonable risks of harm. The Eighth Amendment prevented the Defendants from exercising deliberate indifference toward Francis Wabibi's safety, security, and constitutional rights.

402.

Unconstitutional hiring, training, supervision, staffing, and or practices related to the handling of detainees and or arrestees at Fulton County Jail include but are not limited to:

    a. Jail staff is not adequately trained, staffed, and supervised in adequately protecting incarcerated people from a substantial risk of serious harm from violence by other incarcerated people inside its facilities.

b.  Jail staff is not adequately trained, staffed, and supervised in protecting vulnerable populations, including people with serious mental illness, from violence.

c.  The Jail does not provide adequate staffing and supervision to keep people safe.

d.  Jail staff is not adequately trained, staffed and supervised in taking appropriate measures to prevent the movement of contraband into and around its facilities.

e.  The Jail has inadequate systems for identifying, investigating, and preventing violence due to inadequate training, staffing and supervision of Jail staff.

f.  The Jail is hazardous and unsanitary and the Jail fails to maintain clean, hygienic, and safe conditions, due to inadequate supervision, staffing, and training of Jail Staff.

g.  Food at the Jail is insufficient and nutritionally inadequate, and food preparation and delivery services are unsafe due to inadequate supervision, staffing, and training of Jail Staff.

h.  Fulton County and the Fulton County Jail fail to provide constitutionally adequate medical and mental health care to people at

the Jail due to inadequate training, staffing, and supervision of Jail
staff.

i.   Inadequate medical care due to inadequate supervision, staffing, and
     training of Jail Staff exposes incarcerated people to a substantial risk
     of serious harm, including death.

j.   The Jail fails to provide adequate treatment including referrals,
     testing, and follow-up care due to inadequate supervision, staffing,
     and training of Jail Staff.

k.   The Jail's medication administration puts incarcerated people at
     substantial risk of serious harm due to inadequate supervision,
     staffing, and training of Jail Staff..

l.   The Jail's failure to provide adequate medical care inside the Jail
     includes failure to provide confidential healthcare screening, failure to
     provide sick call slips and respond to sick call requests promptly,
     failure to provide adequate treatment and monitoring for people
     withdrawing from substance use, and failure to provide access to
     physical therapy services and supportive medical equipment when
     needed,

m. The Jail fails to provide appropriate medical aid in life-or-death situations due to inadequate supervision, staffing, and training of Jail Staff.

n. People with mental health needs experience poor Jail conditions and deficient mental health care and the Jail environment is harmful to people with mental health needs due to inadequate supervision, staffing, and training of Jail Staff.

o. The Jail does not provide adequate treatment to people with mental health needs due to inadequate supervision, staffing, and training of Jail Staff.

p. Inadequate mortality reviews, psychological autopsies, and oversight practices fail to correct deficient care.

403.

Insufficient hiring, training, supervision, staffing, policies, customs, and or practices related to the handling of detainees and or arrestees, and failure of Defendants to take reasonable measures to prevent the conduct that is complained of herein, constituted a deliberate indifference to the safety, security, and rights of Francis Wabibi and exposed Francis Wabibi to unreasonable risks of harm.

404.

Insufficient hiring, training, supervision, staffing, policies, customs, and or practices related to the handling of detainees and or arrestees, and failure of Defendants to take reasonable measures to prevent the conduct that is complained of herein, directly caused the injuries and death that Mr. Wabibi suffered from.

405.

The U.S. Constitution imposes duties on jail officials, who must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

406.

The U.S. Supreme Court has made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

407.

It is well established that "confinement in a prison where violence and terror reign is actionable." *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (*citing Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir.2005) (alteration in original) (internal quotation mark omitted)).

408.

As demonstrated above, the Jail is perhaps the most dangerous county jail in Georgia, and the violations of inmate's federally protected rights is so widespread,

persistent, and pervasive that a federal investigation determined that Fulton County Jail is structurally unsafe, that prevalent violence has resulted in serious injuries and homicides.

409.

Violence and terror reign at the Fulton County Jail to such an extent that Francis Wabibi's death at the hands of his cellmate is actionable under clearly established federal law.

410.

Sheriff Labat had actual and constructive knowledge of widespread, persistent pattern of inmate-on-inmate violence.

411.

Sheriff Labat has failed to properly manage the budget provided to him and has been criticized for so doing by the Fulton County Board of Commissioners.

412.

The widespread pattern of constitutional deprivations at Fulton County Jail lead directly to the death of Francis Wabibi.

413.

Sheriff Labat's failure to develop, promulgate, and enforce lawful policies outlining the guidelines for segregating inmates with mental-health issues and

adequately monitor inmates to keep them safe—and his failure to properly train its officers and agents to follow such guidelines—constitute deliberate indifference to the Constitutional rights of citizens.

414.

Sheriff Labat has failed to adequately hire, train, supervise, and instruct officers in keeping inmates reasonably safe from the threat of inmate-on-inmate violence.

415.

Sheriff Labat by and through his acts and omissions has failed to implement meaningful accountability measures and have failed to conduct thorough investigations into acts of violence.

416.

Sheriff's Labat's above failures amount to deliberate indifference to the safety of inmates in violation of the Fourteenth Amendment.

417.

Proper training of jail staff would have prevented Francis Wabibi's death.

418.

Captain Johnson is liable to Plaintiffs for his failure to adequately supervise jail staff, including Defendants Detention Officer S. Tilley, individually, and Cadet Deputy Anthony Okonkwo, individually, on the night of Francis Wabibi's death.

419.

Supervisory liability under 42 USC § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation.

420.

Captain Johnson was subjectively aware of the actions and omissions of the other Defendants, including Defendants Detention Officer S. Tilley, individually, and Cadet Deputy Anthony Owkonkwo, individually, on the night of Francis Wabibi's death.

421.

Captain Johnson ratified the actions and omissions of the other Defendants, including Defendants Detention Officer S. Tilley, individually, and Cadet Deputy Anthony Owkonkwo, individually, on the night of Francis Wabibi's death., by failing to take reasonable steps to immediately intervene to remedy the constitutionally infirm conditions that led to the inadequate treatment Mr. Wabibi was subjected to, failing to ensure sufficient security rounds, and failing to prevent

the placement of Mr. Wabibi into a volatile environment which thereby created significant risks of harm to Mr. Wabibi.

422.

Captain Johnson moreover was unwilling, incapable, and or refused to take action to supervise his underlings and Defendants Detention Officer S. Tilley, individually, and Cadet Deputy Anthony Owkonkwo, individually, to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners and which resulted in Mr. Wabibi's injury, disfigurement, pain and suffering, constitutional deprivations, medical bills, wrongful death, and other harms and damages.

423.

Captain Johnson fostered an unreasonable environment of violence which motivated and encouraged inmates to commit violence against each other and which resulted in Mr. Wabibi's injury, disfigurement, physical and emotional pain and suffering, extreme emotional distress, constitutional deprivations, medical bills, wrongful death, and other harms and damages.

424.

As a result of the constitutional violations described herein, Mr. Wabibi suffered physical and mental pain and suffering, serious bodily injury, extreme

mental distress, disfigurement, violations of constitutionally protected rights, medical bills, wrongful death, and other general and special damages.

## COUNT VI

### **State-Law Claim for Wrongful Death against All Defendants**

425.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-338 of the instant Complaint as if fully set forth herein verbatim.

426.

Francis Wabibi was unmarried and without children at the time of his death on November 23, 2022.

427.

Plaintiff Ngambula Wabibi is Francis Wabibi's surviving mother.

428.

Plaintiff Vemba Wabibi is Francis Wabibi's surviving father.

429.

Plaintiff Ngambula Wabibi brings this claim in her individual capacity to recover for the wrongful death of her son, Francis Wabibi, under Georgia's wrongful-death statute.

430.

Plaintiff Vemba Wabibi brings this claim in his individual capacity to recover for the wrongful death of his son, Francis Wabibi, under Georgia's wrongful-death statute.

431.

Francis Wabibi died on November 23, 2022, as a direct result of Defendants' above-described constitutional deprivations.

432.

Plaintiff Ngambula Wabibi seeks to recover the full value of the life of Francis Wabibi against all Defendants under Section 1983 and Georgia's wrongful-death statutes.

433.

Plaintiff Vemba Wabibi seeks to recover the full value of the life of Francis Wabibi against all Defendants under Section 1983 and Georgia's wrongful-death statutes.

## COUNT VII

### Estate Claims Against All Defendants

434.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-338 of the instant Complaint as if fully set forth herein verbatim.

435.

As set out above, Mr. Wabibi sustained physical and mental pain and suffering, disfigurement, extreme mental distress, and other general damages as a direct result of Defendants' acts and omissions which constitute violations of federal and state law, violations of constitutional rights, negligence, and otherwise tortious activity.

436.

As set out above, Mr. Wabibi and/or Plaintiff incurred medical expenses, ambulance expenses, burial/funeral expenses, and other special damages as a direct result of Defendants' acts and omissions which constitute violations of federal and state law, constitutional violations, negligence, and otherwise tortious activity.

437.

In her capacity as the Anticipated Administrator of the Estate of Francis Wabibi, Plaintiff is entitled to recover all damages to which Mr. Wabibi would have been entitled to had he survived.

438.

As a result of the Defendants' wrongful conduct, Mr. Wabibi incurred medical and related expenses for his care, treatment, and services prior to and after his death. Mr. Wabibi also endured physical and mental pain and suffering and was emotionally affected as a result of Defendants' violations of federal and state law,

constitutional violations, negligence, and otherwise tortious activity prior to his death.

439.

Based on the foregoing, Plaintiff as the Anticipated Administrator of the Estate of Francis Wabibi is entitled to recover from Defendants damages equal to all expenses incurred in the provision of medical care and treatment to Mr. Wabibi resulting from the Defendants' wrongful conduct and to recover for Mr. Wabibi's final expenses. This Plaintiff is also entitled to recover damages for Mr. Wabibi's physical and mental pain and suffering prior to his death.

## COUNT VIII

### Punitive Damages Against Defendant Sheriff Labat, Defendant Richardson, Defendant Tilley, Defendant Okonkwo, and Defendant Johnson,

440.

Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1-338 of the instant Complaint as if fully set forth herein verbatim.

441.

Defendants' actions showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against the

Defendants in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

442.

Defendant Labat's actions in enforcing and employing unconstitutional policies, customs, and practices with knowledge of the horrible consequences, including death, assaults, inadequate mental and medical care, and inhumane living conditions which were occurring as a result of these policies, practices, and customs showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against Defendant Labat in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

443.

Defendant Labat's actions in acting deliberately indifferent as to the training, supervision, hiring, and staffing of his Jail staff with knowledge of the horrible consequences, including death, assaults, inadequate mental and medical care, and inhumane living conditions which were occurring as a result of this inadequate training, supervision, hiring, and staffing showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive

damages against Defendant Labat in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

444.

Defendant Richardson's actions in placing Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against Defendant Richardson in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

445.

Defendant Tilley's actions in placing Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi as well as acting deliberately indifferent in failing to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds, showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against Defendant Tilley in an

amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

446.

Defendant Okonkwo's actions in placing Mr. Wabibi in a cell with inmate Loosecase Simeon Keith Lucas knowing that Loosecase Simeon Keith Lucas was capable and likely to kill Mr. Wabibi as well as acting deliberately indifferent in failing to keep Mr. Wabibi reasonably safe by conducting sufficient security rounds, showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle Plaintiffs to recover punitive damages against Defendant Okonkwo in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

447.

Defendant Johnson's actions in failing to take steps to immediately intervene to remedy the constitutionally infirm conditions that led to the inadequate treatment Mr. Wabibi was subjected to, failing to ensure sufficient security rounds, and failing to prevent the placement of Mr. Wabibi into a volatile environment which thereby created significant risks of harm to Mr. Wabibi., showed willful misconduct, wantonness, and the entire want of care which would raise the presumption of conscious indifference to the consequences so as to entitle

Plaintiffs to recover punitive damages against Defendant Johnson in an amount to be determined in the enlightened conscience of impartial jurors to punish, penalize, and deter Defendants from repeating their conduct.

448.

Defendant Sheriff Labat, Defendant Richardson, Defendant Tilley, Defendant Okonkwo, and Defendant Johnson acted with the specific intent to cause harm in that Said Defendants desired to cause the consequences of their actions and/or knew that the consequences of their actions were substantially certain to result.

449.

Wherefore, Plaintiffs are entitled to recover punitive damages against Defendant Sheriff Labat, Defendant Richardson, Defendant Tilley, Defendant Okonkwo, and Defendant Johnson.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages and request the Court:

a. that summons and process issue as required by law;

b. Allow a trial by jury on all issues so triable;

c.    that judgment issue in favor of Plaintiffs and against Defendants on all counts of Plaintiffs' Complaint;

c. Award Plaintiffs compensatory and punitive damages against all Defendants;

d. Grant costs of this action, interest, and attorneys' fees per 42 U.S.C. § 1988;

e. Award Plaintiff Ngambula Wabibi the full value of the life of Francis Wabibi as determined in the enlightened conscience of a jury;

f. Award Plaintiff Vemba Wabibi the full value of the life of Francis Wabibi as determined in the enlightened conscience of a jury;

g.   that judgment issue in favor of Plaintiff Shana Wabibi as the Anticipated Administrator of the Estate of Francis Wabibi and against Defendants awarding the Estate of Francis Wabibi general, special, and compensatory damages, including but not limited to physical and mental pain and suffering in an amount to be proven at trial;

h.   that judgment issue in favor of Shana Wabibi as the Anticipated Administrator of the Estate of Francis Wabibi and against Defendants awarding the Estate of Francis Wabibi punitive damages in an amount determined at trial by the enlightened conscience of a fair and impartial jury; and

i. Award further relief as the Court deems equitable, proper, and just.

Respectfully submitted this 19th day of November, 2024.

**ERIC J. HERTZ, P.C.**

By:    */s/ Eric J. Hertz*
          ERIC J. HERTZ
          Georgia Bar Number 349501
          *hertz@hertz-law.com*
          JESSE A. VAN SANT
          GA State Bar No. 558101
          *jesse@hertz-law.com*

*Counsel for Plaintiffs*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
Tel: (404) 577-8111
Fax: (404) 577-8116